Peelle, Ch. J.,
delivered the opinion of the court: ■
To the petition herein the defendants file a demurrer in these words:
“And now comes the said defendants, by their Attorney-General, and, demurring to the petition in this cause, state as the ground thereof that the petition does not allege facts sufficient to constitute a cause of action.
*472 “And further, demurring to each and every item of said petition, state as ground thereof that the allegations of facts setting forth each of said items of the claim do not constitute a cause of action as to any one of the items therein contained.”
The claimants, as stated in their brief, proceed upon the theory that the claims arose “ either under the terms of the contract or for damages by reason of violations of the contract by the defendants;” and upon that theory we will proceed to consider the demurrer.
The defendants contend,' though no demurrer is filed on that ground, that there is a misjoinder of causes of action in this, that some of the claims arise out of the contract while others are based on quantum meruit, but as was said in the case of (Hark v. United States (95 U. S., 539-543):
“ The forms of pleading in the Court of Claims are not of so strict a character as to preclude the claimant from recovering whatris justly due to him upon the facts stated in his petition, although due in a different aspect from that in which his demand is conceived.”
The material facts averred are substantially these: In April, Í903, the claimants entered into a contract with the United States through Capt. W. E. Craighill, Corps of Engineers, United States Army, whereby the claimants obligated themselves to provide the necessary plant and to furnish all the materials and perform all the labor required for the construction and completion of locks and dams Nos. 1, 2, and 3, in the Warrior and Tombigbee Rivers, in the State of Alabama, in accordance with the specifications and drawings attached to the contract and made a part of the petition as Exhibit A.
Pursuant to the contract, the claimants began at once to carry out its provisions and performed on each lock and dam certain work, aggregating nearly $200,000, for which work the claimants were paid, less the reservation of ten per centum amounting to $17,777.31 and the further sum of $2,985.71 for a like percentage reserved from payments made on cement, making’the aggregate amount retained $20,763.02. The claimants also aver that they performed certain work in the month of December, 1904, for which no payment or *473 estimate therefor was made by the defendants, amounting to $5,000.
From the date of the contract to December 31, 1901, the claimants aver that they were delayed and obstructed in the execution of the contract by the failure of the defendants through their proper officer to furnish detailed plans for the execution of the work, by uncertainty as to the method in which the work was to be done, and by changes of plans while the work was under construction. It is also averred that the claimants were frequently required to perform work not authorized by the contract and specifications and for which they were not paid because the defendants asserted that the same was within the original contract, against the doing of which work the claimants repeatedly protested.
It is further averred that the claimants were improperly threatened by the engineer officer in charge.with forfeiture of their contract and upon appeal to the Secretary of War and the Chief of Engineers the facts in relation thereto were misrepresented by the engineer in charge, and that the discretion reposed by the contract in the engineer officer was exercised by him unreasonably, capriciously, and with malice toward the claimants.
The details of the improper obstructions, delays, .exactions, threats, misrepresentations, etc., relied upon as grounds for the abandonment of the contract are set forth in a communication to the Secretary of War under date of December 31, 1904, which is attached to and made part of the petition as Exhibit B. The letter, with the contract and specifications, made part of the petition, as well as the other facts pleaded, must be considered together. The demurrer only admits the facts well pleaded. Dillon v. Barnard (21 Wall., 430-437).
The acts of the engineer officer referred to in said letter, it is averred, constitute a breach of the obligations of the contract with the United States, which gave the claimants the right to abandon the contract and the further prosecution of the work thereunder, which they accordingly did, and notified the Secretary of War as aforesaid.
How and when the residue of the work under the contract was completed, if at all, and the cost thereof, does not ap *474 pear, nor does it specifically appear in the letter to the Secretary of War what expense or loss the claimants incurred or suffered by reason of the acts of the engineer in charge, made the basis for the abandonment of the contract.
The demurrer raises the questions:
1. Were the acts of the engineer officer sufficient to justify the claimants in the abandonment of their contract? That is to say, was the performance of the contract defeated or rendered unattainable by the misconduct of the defendants’officer? In other words, was the conduct of the officer at variance with the spirit of the contract ?
2. Though the acts of the engineer officer were not a breach of the contract justifying its abandonment, yet are not the facts pleaded as to certain items of the claim sufficient to constitute a cause of action? If-so, the demurrer as to such items should be overruled.
3. Though the acts of the engineer officer were a breach of the contract, giving the claimants the right to abandon the same, still are the facts pleaded as to certain items sufficient to constitute a cause of action? If not, the demurrer as to such items should be sustained.
We will state briefly the rules which we think should govern the case as now presented. Where a party competent to act enters into a lawful contract, free from fraud, misrepresentation, or duress, and the contract is possible of performance, the party so charging himself must make it good unless the act of God, the law, or the other party intervene to prevent its execution. Unforeseen difficulties, however great, will not excuse him. Dermott v. Jones (2 Wall., 7); Stees v. Leonard (20 Minn., 494). Nor should a contractor who so contracts be excused from the full performance of his contract because of hardships and difficulties arising from authorized changes in the plans and .specifications, as such changes were within the contemplation of the parties. In other words, the impossibilities assigned for the release of one from the performance of his contract must be real and not mere inconveniences. United States v. Smoot (15 Wall., 86). Difficulties and improbabilities of performance arising from such changes will not *475 avail as a ground for abandonment. The Harriman (9 Wall., 161); United States v. Peck (102 U. S., 64). In the latter case it was -held in substance that where one party to a -contract by his conduct prevented the other party from performing his part, he will be excused for nonperformance. See also the case of Warner v. Stoddard (105 U. S., 224-229), where the court said:
“ "Where a party is entitled to the benefit of a contract, and can save himself from a loss arising from a breach of it at a trifling expense or with reasonable exertions, it is his duty to do it, and he can charge the delinquent with such damages only as with reasonable endeavors and expense he could not prevent. Wicker v. Hoppock, 6 Wall., 94, etc.”
Had the claimants been ordered to stop the work, then the case would be like those of United States v. Behan (110 U. S., 338) and Houston Construction Co. v. United States (38 C. Cls., 724) or United States v. Speed (8 Wall., 77). See also the cases of Chicago v. Tilley (103 U. S., 146), United States v. Smith (94 U. S., 214), and Clark v. United States (6 Wall., 548).
It follows, therefore, that to justify the abandonment of the contract the acts of the engineer officer complained of must have been such as would have rendered the performance of the rest of the contract impossible or a thing different in substance from that which was contracted for. Leopold v. Salkey (89 Ill., 422) and Kleine v. Catara (14 Fed. Cas., 731, 736). But in that event, as the powers of the engineer officer, being subordinate, were limited to the execution of the contract and the reasonable and rational interpretation of the specifications to' that end, it was the privilege and duty of the claimants to appeal to the Secretary of War or to the Chief of Engineers whenever in their judgment their rights were being invaded by such subordinate officer. Hawkins v. United States (96 U. S., 689); Driscoll v. United States (34 C. Cls., 525); McLaughlin v. United States (37 C. Cls., 199). This the claimants appear to have done, but they fail to aver in some instances whether the decisions of the engineer officer were modified, approved, or reversed. Failure to appeal for a *476 revision or reversal of the acts of such subordinate officer would justify the conclusion that such acts were acquiesced in by the claimants, unless the work was proceeded with under protest.
Some of the power's of the engineer officer are set forth in the following paragraphs of the specifications, namely:
29. The decision of the engineer officer in charge as to quality and quantity shall be final.
130. The engineer officer shall have the power to prescribe the order aiid manner of executing the work in all its parts, to forbid the use of methods which he deems objectionable, and to inspect and reject materials, work, and workmanship ■which in his judgment do not conform to these specifications or to the drawings which may be furnished from time to time. Any material, work, or workmanship rejected by him shall be kept out of or removed from the finished work, and any payments due the contractor majr be suspended until such material, work, or workmanship be so removed.
131. The United States will keep inspectors on the work, who will receive instructions from a resident engineer, the authorized representative of the engineer officer. They will have power to object to any materials, work, or workmanship. No materials shall bo placed in the work without their knowledge. Any materials, work, or workmanship objected to by the inspectors shall be kept out of or removed from the finished work, unless in each particular case the objection of the inspector shall be overruled by the resident engineer. In all cases of dispute, appeal may be made to the engineer officer in charge, whose decision will be accepted as final.
139. The right is reserved to make such minor changes in these specifications and the letting plans as may be necessary or expedient to carry out the intent of the contract, and the contractor shall do the work according to such changes and at his contract prices. No modification shall be made the basis of a claim for extra compensation, unless so provided in a written supplementary agreement duly authorized, and approved by the proper authorities of the War Department.
143. These specifications are intended to be full, clear, and complete. Any doubt as to their meaning or any obscurity-in the wording of them will be explained by the engineer officer, who shall also have the right to correct any errors or omissions in them whenever such errors or omissions become apparent. His decision in all such cases and upon all matters relating to the work shall be final and binding upon the contractor.
*477 It will thus be seen that the engineer officer was clothed with authority to direct the work in such order and manner as he deemed best, to forbid methods which he deemed objectionable, and to inspect and reject material, work, and workmanship which in his judgment did not conform to the specifications, and his decision in respect thereto, as well as to the the quality and quantity of material to be used, the meaning of the specifications and the correction of any errors or omissions therein, it was agreed, in the absence of fraud or gross error, should be final and binding upon the contractor.
The right was also reserved to the engineer officer to make such minor changes in the specifications as might be necessary to carry out the intent of the contract, and when so made the contractor was to do the work according to such • changes and at his contract prices. Furthermore, by paragraph 28 the contractor was not allowed to take advantage of any error or omission in the specifications, they agreeing to look to the engineer officer for instructions should such error or omission be discovered. And by paragraph 41 it was provided that such decision should not be made the basis of any claim against the United States.
By paragraph 129, respecting the quantities of material, bidders were required to fix their prices so as to permit of increase or diminution, and it was “ agreed that such increase or diminution, whether resulting from error in estimate or from modification of plans, shall form no basis for any claim against the United States,” while by paragraph 35 the claimants assume all risks and agree not to hold the United States liable for damages under or in connection with the contract on account of “ delays in the work due to any cause or in payments due to lack of available funds.” In other words, the claimants agreed to do the woi’k according to the specifications as construed by the engineer in charge, including such minor changes, corrections, and omissions therein as he might deem expedient to carry out the intent of the contract, and that neither such changes nor delays in the work resulting therefrom should form the basis of a claim against the United States.
*478 As was well said by the court, in the case of United States v. North American Commercial Company (74 Fed. Rep., 145-149)
“ It is not unusual for a contractor with the Government, as with other muniiSpal bodies, to repose upon the good faith and discretion of some public officer who represents the Government and is responsible for the protection of his interests in the transaction. Such contractors frequently consent to stipulations by which the value of the contract is substantially controlled by the judgment of such an officer. In such contracts, however, it is implied that the public officer will not act arbitrarily or capriciously, but will exercise an honest judgment.”
In the ruling of the engineer officer the claimants were entitled to the exercise of an honest judgment, weighed by the rule of reason and law. That is to say, the officer whose power as a subordinate is limited should look to the contract ifor his authority in directing the work thereunder, and in his interpretation thereof, as well as in any changes authorized to be made by him in the specifications, he should, keeping in view the purpose and intent of the contract, impose upon the contractor the minimum of additional work and expense.
It is conceded by the claimants that “ they could have gone on with their contract, had they been able to stand the financial loss resulting from the acts of the engineer officer,” and this court would have protected them in their rights upon their making a proper protest from time to time. Roettinger v. United States (26 C. Cls., 391-410). But, they say, “the decisions of the courts are clear that a contractor is not always obliged to continue his work when the owner violates his obligation.”
These positions are both correct, and the question therefore resolves itself into this: Did the defendants, through their engineer officer, violate their obligations in requiring the work to be done under his interpretation of the specifications? That is to say, were the specifications so construed by the engineer officer as to prevent the claimants from doing the work substantially as agreed upon, or was the work required something different from what the claimants agreed to do?
*479 Tested by the rules announced, let us consider the specific grounds assigned for the abandonment of the contract, as set. forth in the letter to the Secretary of War, made part of the petition.
(1) THE ENGINEER SUBMITTED TO THE CLAIMANTS A DRAFT OF A SurPLEMENTARY AGREEMENT PROVIDING:
“ That the United States may exercise its right to make minor changes as provided in paragraph 139 of the specifications, by changing the section of the wall at Lock No. 2 so as to diminish the width and substitute gravel for part of the concrete in the middle of the cross section of the foundations, and it is understood and agreed that the contractors shall make no claim for extra compensation on account of such changes in the lock walls.”
Objection was made to signing the agreement so submitted on the ground that paragraph 139 authorized only minor changes, while the changes proposed in the supplementary agreement, the claimants contend, essentially changed the method of construction. ■
By paragraph 129 it is expressly provided that “ increase or dimintition, whether resulting from error in estimate or from modification of plans, shall form no basis for any claim against the United States,” and if not, then no right could *be based thereon for the abandonment of the contract.
Diminishing the section of the walls and substituting gravel for part of the concrete in the middle of the cross section of the foundations would not render the work different in substance from that which was contracted for. Besides, the substitution of gravel for concrete was optional with the engineer officer under paragraph 97 of the specifications, which provides:
That gravel, as therein defined, “may be substituted, all or in part, for stone filling in dams at the option of the engineer officer, or placed under concrete paving, or used under dam aprons or elsewhere as directed by him.”
The engineer officer was clothed with" authority under paragraph 143 to explain the meaning of the specifications when in doubt--that is, to interpret their meaning — and his decisions in respect thereto, in the absence of fraud or gross *480 error, it was agreed, “ shall be final and binding upon the contractor.”
The claimants were required and did proceed with the work as modified, though under protest, and for more than two months prior to the abandonment of their contract elected to continue work thereon as directed by the engineer officer, without other drawings than those originally furnished to the claimants. But if other drawings were necessary and had been delayed, thereby hindering the work, the contractor, by paragraph 35 of the specifications, expressly agreed to assume all -risk and not to hold the United States “ liable for damages under or in connection with this contract on account of delays in the work due to any cause.” And this doubtless for the reasons set forth in paragraph 32 of the specifications respecting the authority of the engineer officer in case of delays to waive the time limit and to permit claimants to finish the work within- a reasonable time thereafter. True, the petition avers that the change was not a minor one, but as the supplementary agreement shows Avhat the change was, the two must be considered in connection with the specifications.
We therefore reach the conclusion that the change was one authorized to be made by the engineer officer, and it cannot therefore form the basis of any claim against the United States, and hence gave no right to abandon the contract.
(2) TIXE CHANGE OE THE METHOD OE DEPOSITING CONCRETE.
That is to say, the claimants aver that “ before determining on the plant at each lock for mixing and depositing concrete ” they discussed the matter with the engineer in charge, and with his approval adopted the method-of dumping, from a considerable elevation above the bottom of each lock wall, the concrete through chutes into place from cars at a fixed level, and then ramming it as required. The method adopted necessitated the use of chutes to convey the concrete into place, and they, with the approval of the engineer in charge, were adopted. The concrete at Lock No. 1 so deposited was paid for, while at Lock No. 2 a large-amount *481 of Avork bad likeAvise been done and a similar plant bad been installed at Lock No. 3.
NotAvithstanding tlie work so done and paid for, the engineer in charge on November 10, 1904, forbade the further deposit of concrete in that manner, to which the claimants objected, and upon appeal to the Chief of Engineers the decision of the engineer in charge was, on December 2,1904, sustained, on the ground that from an engineering standpoint it ivas not regarded as good practice to allow' freshly-mixed concrete to fall from a great height because of the tendency of the large pieces to separate from the mass, thereby resulting in a mixture without uniformity; and further, because by paragraph 130 the engineer in charge Avas given the “ poAver to prescribe the order and manner of executing the work in all its parts, to forbid the use of methods which he deems objectionable.”
Prior to the appeal to the Chief of Engineers, however, the claimants elected to proceed Avith the work by lowering the concrete in buckets by hand, thereby requiring additional men, but the process was too slow, in the opinion of the engineer in charge, to make a sufficiently thick layer before the material began to set, and he forbade the claimants to make further deposit in that way. After the change in the method of depositing the concrete, the claimants continued work under the contract, though protesting, both to the engineer in charge and to the Chief of Engineers, that the change of method involved them in heavy expense by reason of the delay in buying and installing other machinery suitable therefor.
NotAvithstanding paragraph 88 of the specifications expressly proAÚdes that “ the use of chutes or slides for depositing concrete Avill be avoided as far as practicable,” the engineer in charge approved the use of chutes at the claimants’ request as aforesaid until, in his opinion, it Avas not satisfactory, and then he directed the change to be made, as under paragraph 130 of the specifications he had the right to do.
The performance of the work under the changed method did not involve the doing of something different in substance from that which Avas contracted for, but assuming that both *482 parties acted in good faith and that the claimants, had they completed the contract, might have been compensated in damages on the theory of a breach by the defendants, still, as was said in the case of Dubois v. Delaware Canal Co. (4 Wend, 285):
“ Every breach of a special agreement by one party does not authorize the other to treat it as rescinded; but there are some ■ breaches that do amount to an abandonment of it. There is not, perhaps, any precise rule which when applied to the breach of a contract certainly settles the question whether it is thereby abandoned or not; but if the act of one party be such as necessarily to prevent the other from performing on his part according to the terms of his agreement the contract may, I think-, be considered as rescinded.”
That rule is equally applicable to the present contract. Certainly it could ixot be contended that the change complained of thereby prevented the claimants from performing the contract according to the terms of their agreement, as the method of doing the work was subject to the direction of the engineer officer, by which the claimants, in the absence of fraud or gross error, agreed to abide. The most that can be said is that the engineer officer at first approved the method adopted for depositing the concrete, and then after certain of the work had been done he, for reasons concurred in by the Chief of Engineers, changed the method, thereby subjecting the claimants.to loss. But assuming such action to have been a partial failure on the part of the defendants, it is a recognized principle that a partial failure of performance by one party to a contract which may be compensated in damages does not give the other party the right to rescind or abandon the contract. Franklin v. Miller (4 A. & E., 599); Selby v. Hutchinson (4 Gilman, Ill., 333).
In the case of Hawkins v. United States (96 U. S. 689) the claimant agreed to furnish to the United States rubble-stone for the construction of a public building of certain di-. mensions at a certain price, and it was provided that there should be no departure from the quality, dimensions, and price of the stone without the written consent of the Secretary of the Treasury. Although such consent was not given, the officer in chai'ge of the woi*lc declined to receive the stone, *483 though in conformity with the contract, and required the claimant to furnish other stone of a different and more expensive kind, which the claimant did, and then brought suit for the difference, and he was held entitled to recover. But that is not this case. Here the engineer officer, after having sanctioned one method of depositing the concrete, imposed a hardship upon the claimants by changing the method and requiring the concrete to be deposited in a different manner. But the method of doing the work was by the express terms of the contract within the power of the engineer officer, and while the change in the method imposed a loss upon the claimants which might have been compensated in damages, had they completed their contract, as in the Hawkins case, such change gave no right to abandon the same. And this view is in harmony with the case of Kleine v. Catara (14 Fed. Cas., 732-736), supra, cited by the claimants, respecting the failure of one party to comply with certain stipulations in the contract, and the consequent abandonment of the contract by the other party, where it is said:
“ Where any stipulation becomes incapable of being performed substantially in the manner in which the parties intended, by the voluntary act of either of them, the other party is not bound to proceed, but is at liberty to decline a perform-, anee thereof on his part.”
As the method of depositing the concrete was not disclosed in the specifications but was lodged in the engineer officer who directed the work, by whose acts the claimants agreed to abide, there ivas no breach of the contract in changing the method of depositing the concrete, and hence no right to abandon the same.
(3) FAILURE TO MAKE PAYMENT FOR CEMENT FURNISHED IN ADVANCE OF THE PROPER TIME FOR ITS USE IN THE WORK.
Paragraph 141 of the specifications provides:
“ If the contractor, in judicious prosecution of his work, shall prepare material in advance of the proper time to put it in the work, the engineer officer may, at his discretion, pay the contractor for any such material, after its inspection and delivery at the lock site or in its immediate vicinity, such portion of the contract price as the engineer officer *484 may elect. Material so paid for shall become the property of the United States.”
As cement thus furnished in advance was liable to become damaged while in storage, depending upon the condition of the weather and the place of storage, the question at whose, risk the cement was to be stored arose, and as the claimants desired to order cement in large lots, the engineer, on December 30; 1903, agreed, in the exercise of his discretion, under said paragraph, to pay for cement so furnished on. delivery, on condition that the claimants would agree “ to replace with good cement any of such cement that may become damaged while in storage,” to which the claimants in February, 1904, agreed, and they subsequently delivered and stored about 28,245 barrels of cement, of which all but 6,434 barrels were subsequently inspected and paid for, less ten per cent retained, leaving the residue of said cement, amounting to the'sum of about $15,000,‘unpaid for, because, as averred, of the improper and unwarranted failure of the United States to inspect the same.
The. claimants’ contention is that by virtue of the agreement of the engineer in charge to pay for cement so delivered and the payment of a part therefor, the whole of said cement thereby became the pro}3erty of the United States under said paragraph 141, and that their delay to inspect and pay for the same imposed upon the claimants a loss. This may be true, but it gave no right to abandon the contract even if the amount paid under said paragraph is less than the portion of the contract price the engineer officer elected to pay. Nor is there any averment that the claimants were thereby prevented from performing their contract in terms as agreed upon, or that the defendants had refused or would refuse to deliver the cement to the claimants on demand. Nor is there- any averment that the cement unpaid for is in good condition, but as this is a matter of defense, as well as the quantity and quality of cement and the balance due thereon, we need not pursue this branch of the case further, for as to this item the demurrer must be overruled, even if the grounds for the abandonment of the contract are held not good.
*485 (4) CHANGES IN THE LOCK FOÜNDATION AND FLOOR AT LOCK NO. 3.
Paragraph 64 of the specifications provides:
“ Sheet and foundation piles may be omitted altogether, where unnecessary in the judgment of the engineer officer, and in such cases the foundations will be built directly' on the natural ground, and shall be carried down to such depths and widths as may be required by him. It is understood and agreed that the contractor shall make no claim against the United States on account of any such changes in the plans or of any increase or decrease in the depth of foundations.”
It is averred in substance that August 10,1904, the engineer in charge informed the claimants that a wooden floor upon piles at Lock No. 3 would, as originally planned, be installed, and that acting upon such information they, on August 12, 1904, gave the order for the lumber and other material therefor and proceeded to drive the piles and make the necessary excavation therefor. But that on September 12 thereafter the plan was changed by the engineer in charge, and a concrete floor was determined upon, thereby imposing upon the claimants additional work and expense, to which they protested and appealed to the Chief of Engineers, who, on the report of the engineer in charge, decided that the claimants’ assumption that it is the present purpose of the engineer in charge “ to install the concrete floor is an error.” But whether an error or not, or whether the loss was one which could have been compensated in damages is immaterial now to decide, as the change, if made, would not have prevented the claimants from performing their contract in substance, if not in terms, as agreed upon.
Furthermore, by the express terms of said paragraph 64 the claimants agreed that they would “ make no claim against the United States, on account of any such changes in the plans or of any increase or decrease in the depth of foundations.” Hence we reach the conclusion that if such change could not have been made the basis for a claim against the United States it gave no right or ground to the claimants to abandon their contract.
*486 (5, 6, 7, 8) GROUNDS RESPECTING THE PILING AND SHEET PILING AT LOCK NO. 3, THE FOUNDATIONS BELOW THE NATURAL GROUND AND THE BUILDING OP COFFERDAMS.
Tlie grounds here assigned all go to the method and manner of doing the work under the interpretation of the specifications by the engineer officer.
Under paragraphs 130 and 143 the method of doing the work, as well as the interpretation of the specifications under which the work was to be done, ivere lodged in the engineer officer, whose decision “ in all matters relating to the work,” it aauts agreed, “ shall be final and binding upon the contractors.” Ilis action therein AAras in accordance with the specifications; and the additional expense thereby imposed upon the claimants was Avithin the contemplation of the parties and therefore did not operate to prevent the claimants from executing the contract in substance as agreed upon, and hence gave no right to abandon the contract.
(0) FOR DECEPTIVE BORINGS BY THE DEFENDANTS.
The claimants in substance aver that in making their bid they relied upon certain borings there stated, but by paragraph 20 bidders AA’ere informed that the quantities given AArere approximate and that no claim should be “ made against the United States on account of any excess or deficiency, absolute or relative, in the same.” And further, that bidders Avere instructed and expected to examine the maps and draAVings and “ to Ausit the locality of the work, and to make their oaaui estimates of the facilities and difficulties attending the execution of the proposed contract, including local conditions, uncertainty of Aveather, and all other contingencies.”
Paragraph 50, respecting the materials shown by the bor-ings, expressly provides that “ bidders must inform and satisfy themselves as to the nature of the material. The United States Avill not guarantee the accuracy of its information. The limits of excaA^ation shown on the drawings and the amounts herein given are approximate and may be greater or less as the local conditions may demand or justify.”
A question somewhat similar to this Avas involved in the case of Simpson v. United States (31 C. Cls., 217) wherein, *487 in substance, it was held that such borings and the material therefrom did not constitute a guarantee upon the part of the United States that the soil was as represented by such borings, and this would certainly be true where bidders were instructed to make examination for themselves.
As no guarantee was given- respecting the character of materials shown by the borings and the claimants were admonished to make their own investigation and estimates, no claim can be founded on the claimants’ neglect to conform to the directions to ascertain for themselves what they were bidding on, and hence no ground for the abandonment of their contract.
There is no conflict between the view here expressed and the case of the Atlantic Dredging Co. v. United States (35 C. Cls., 463-478). There the material to be excavated was shown by the contract to be “ chiefly sandy mud and a little gravel,” whereas, as a matter of fact, the material to be excavated differed very materially therefrom and was much more expensive to. excavate. The court held that the language of the contract in that case was a warranty on the part of the United States as to the character of the material to be excavated, and being a warranty the same was not waived, though the claimant may have made an examination as to the character of such material. In commenting on the difference between that case and the case of Simpson v. United States (172 U. S., 372), affirming this court (31 C. Cls., 217), the court said:
“ The Simpson case differs very much from the case at bar in this, to wit, in that case the contract of warranty as contended for by the claimant depended upon the use of the expression ‘ upon a site that was available,’ without any designation of the character or quality of the material to be excavated; in this case there is a specific description of the kind of material which is to be removed, to wit, to consist chiefly of ‘ sandy mud and a little gravel.’
“ In the Simpson case the alleged warranty related to the surface indications of an available site open to the inspection and view of the claimant; but in this case the alleged warranty is as to the composition of the material composing the shoals which by the terms of the agreement were to be dredged. The one stated an available *488 site as to space and environment; the other relates to the character and quality of the material, which is shown by the findings to have been very important, inasmuch as when the true character of the shoal was known a contract was let at nearly double the price for which the claimant was to do the work. One related to the surface or site; the other refers to composition hidden from the view.1’
Here the specification (50) expressly provides that “the United States will not guarantee the accuracy ” of the information shown by the borings.
(10) DELAYS AND OBSTRUCTIONS.
The various grounds heretofore considered are assigned under the above heading, but they have been considered in detail and we need oifiy say that the delays caused by reason of the engineer in ,charge Avere due to the manner and method of doing the work, and that the power to make the changes as well as the method of doing the Avork Avere lodged in said officer by agreement between the parties, as shown by the various provisions of the specifications referred to and particularly of paragraphs 29, 130, 139,143, and 35, in which latter it is expressly jjroAdded that the claimants assume all risks and that the United States is “ in no case to be hqld liable for damages under or in connection Avith this contract on account of delays in the Avork due to any cause.”
That language is broad and comprehensive, and interprets itself, hoAvever hard it may be on the claimants in the execution of the contract. They Avere conipetent to enter into the contract, and having done so, they must perform their obligations unless the acts of the engineer in charge can be shown to have prevented them from performing the same substantially as agreed upon, or that the acts of the engineer were'1 fraudulent or so gross as to amount to fraud. This they have not done. On the contrary, the specific acts of the engineer complained of as grounds for abandonment appear to haA^e been directed by or to come Avithin the terms of the contract and specifications, and hence gave the claimants no grounds to abandon their contract.
*489 (11) OBLIGATIONS OF THE GOVERNMENT TO PROMPTNESS.
Under this heading the claimants refer to paragraph 31. requiring them to commence work in earnest on each lock within sixty days after notice of approval of the contract by the Chief of Engineers, and to prosecute the work with faithfulness and energy, while paragraph 36 gives to the Government the right to assume the Avork, if the claimants fail to so prosecute the work, and from these premises the claimants contend the GoATernment was under a corresponding-obligation to furnish drawings and plans and to lay out the Avork so as to enable the contractor to complete the same within the contract time.
This is undoubtedly true, and if the work was not completed within the time, paragraph 32 of the specifications gives the engineer in charge, with the sanction of the Chief of Engineers, authority to Avaive the time limit and to permit the contractor to finish the Avork within a reasonable period thereafter. And while it also therein provides that all expenses of inspectiqn and superintendence and actual loss to the Government shall be ascertained by the engineer and deducted from any payment due or to become due under the contract, it further provides that the engineer, with the sanction of the Chief of Engineers, may remit the charges for inspection and superintendence for so much of the time as in the judgment of the engineer in charge may actually have been lost on account of unusual freshets, ice, etc., or other unforeseeable causes of delay arising through no fault of the claimants.
There is no averment that the delays caused by the engineer officer respecting the change in the plans, the work required, or the method of doing the same avouIc! have prevented the claimants from completing their contract substantially as agreed upon, or that their right to damages, if entitled thereto, would have been lost or impaired by completing the contract. In a similar case the contractors completed the Avork and this court gave them a judgment for the damages sustained. The Cramp Case (41 C. Cls. ). We are therefore unable to hold that such delays Avere sufficient to justify the abandonment of the contract.
*490 (12) IMPROPER CORRESPONDENCE WITH SUBCONTRACTORS.
There is no specific mention of this in the petition, but is iii the letter to the Secretary of War made part of the petition. The averment in substance is that on March 22, 1904, the engineer officer, after saying that he would not thereafter furnish to cement dealers any further information direct, respecting the state of tests and other facts in regard thereto, did on October 12, 1904, write a letter to the Carolina Portland Cement Company in response to its request, in which he stated that “ all the Old Dominion cement furnished M. T. Lewman and Co. for work under this office has been tested and accepted.” And further, that he had no interest in its controversy with the claimants, to whom his dealings were entirely confined.
'The claimants’ contention is that, as paragraph 75 of the specifications provides, “ Manufacturers’ certificates shall be furnished for each shipment showing that the cement was stored in bins for not less than six weeks before shipment, and no cement shall be used in the work until such certificates are furnished,” that therefore such cement could not have been tested and received until such certificates had been furnished. But the furnishing of such certificates is not, under the specifications referred to, made a condition precedent to inspection and acceptance. The prohibition therein contained is against the use of the cement until such certificates are furnished and is an additional safeguard to the inspection itself.
But the claimants do not aver any loss or delay growing out of the correspondence by the engineer officer, nor is it shown by the facts pleaded, coupled with the specification cited, that the information given by the officer was untrue or even improper, as the information sought for was as to his own act, and no one but he could have answered the question as to whether the concrete had been inspected and accepted; so no reason is here shown for the abandonment of the contract.
*491 (13) CONDUCT 03T ENGINEER OFFICER IN CHARGE.
The claimants in substance aver that in May, 1904, in the lobby of the Demopolis, at Demopolis, Alabama, the engineer officer, in a voice loud enough to be heard by a number of persons- there present, said that if the claimants did not sign a certain supplementary agreement which had then been prepared and presented to them for their signature, he would take the contract away from them. That the statement so made was calculated to injure their credit.
Soon after the conversation referred to, the engineer wrote to the claimants that he desired frequent reports of the progress, of the work; that he was not satisfied with the. progress tliej^ were making and unless they did better he expected to take steps provided for by paragraph 36 of the specifications to hasten the work. In response to that the claimants wrote, expressing surprise at the engineer’s dissatisfaction, as they were aware of none in the past. That delays had doubtless been foreshadowed if not then created by the uncertainty of the Government as to proposed changes in plans and the future mode of executing the work. That their writing to the Secretary of War, which the engineer spoke of in his letter as “ wasting valuable time,” had not retarded the work, they having pursued that course on the advice of counsel to save their rights.
The claimants’ contention is that such threats evince a purpose to force them to the wall in disregard of their rights, but’ from the correspondence set forth in the letter to the Secretary of War we fail to see any such purpose, nor is any loss or delay averred as a result of such threats. Under the contract the engineer officer was endeavoring to secure the completion of the work bjr the claimants, and to that end notified them that unless they did better in the future he would exercise his right under paragraph 36 to hasten the work.
Much more is said about the spirit which controlled the officer in his treatment of claimants and the uncomplimentary way in which he characterized them, but no act of his in that respect is shown to have delayed the work or in any way pre *492 vented the claimants from the execution of their contract. Nor is it shown from the facts pleaded, coupled with the specifications and the contract, that the engineer officer failed to exercise an honest judgment in his decisions respecting the changes made or the method and manner of the work done and to be done by the claimants, whatever he may have said of them personally, and hence no ground or reason for the abandonment of their contract.
The reasons assigned for the abandonment of the contract, considered singly or as a whole, cannot be held to have been such a breach of the contract as would have prevented the claimants from the performance thereof substantially as agreed upon. The acts of the engineer officer complained of were authorized by or were within the terms of the contract and so far as disclosed were approved by the Chief of Engineers, and whatever hardship or losses may have been incurred by the claimants by reason of such acts must therefore be held to have been within the contemplation of the parties, and hence cannot be assigned as grounds for the abandonment of the contract.
The claimants had undertaken an entire work and by the terms of their contract had obligated themselves to furnish all the labor and materials necessary to complete the same, and not having been prevented therefrom by the act of God, the law, or the other party, ancl no waiver by the defendants of full performance, their abandonment of the contract was without right and unjustifiable.
The claimants not having the right to abandon their contract, they perhaps in strictness would not be entitled to recover for the work done in December, 1904, or for the cement delivered and unpaid for. But we are not inclined on the demurrer now to so hold, whatever may be the result on the trial on the merits. '
In the case of Thomas Poynter v. United States (41 C. Cls., -) the claimant had obligated himself to dredge to a maximum depth of 30 feet of water where the wreck of a vessel lay in the Delaware River, and after having dredged to a maximum depth of 26 feet, which enabled smaller vessels to navigate, the claimant became bankrupt and voluntarily *493 abandoned bis contract. The Government refused to receive the work or to waive full performance, claiming to have received comparatively little benefit, and the claimants were held not entitled to recover. Here the claimants had performed part of the work, for which they were paid, less the reservation of 10 per cent, and had also furnished certain material, for which they had been paid in part, less the reservation of 10 per cent, and for work clone in December, 1904, for which no estimate or payment was made. ■ Whether the residue of the work under the contract has been completed, and the cost thereof, do not appear, but that will be matter of defense as to the items just mentioned, and hence the final decision in respect to each of said items is reserved until the hearing on the merits.
Our conclusion on the whole case on demurrer therefore is that in respect to the grounds for the abandonment of the contract and the damages alleged therefor, including profits, the demurrer must be sustained, but in respect to the items of the claim for retained percentages, work done in December, 1904, and for cement delivered and not paid for the demurrer in respect thereto must be overruled.
The claimants will be allowed sixty days in which to amend their petition, and if not then clone and time therefor has not been extended by the court, the petition as to all items except the three last mentioned will be dismissed; and if no appeal be taken therefrom, the claimants, in accordance with Devised Statutes, section 10U, will then be permitted to proceed to take testimony respecting said three items and none other.